UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRELL CROOMS, JOHN LOPEZ, LATRICE SAXON, and STEPHANIE HILL, individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 19-cv-2149 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SOUTHWEST AIRLINES CO., | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Darrell Crooms, John Lopez, Latrice Saxon, and Stephanie Hill worked as Ramp Agents for Southwest Airlines at Midway Airport in Chicago. They brought claims against Southwest and Kronos, Inc., alleging that Southwest collected their fingerprints but failed to comply with the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.*

Three months after they filed suit, the Seventh Circuit issued its decision in *Miller v. Southwest Airlines Co.*, 926 F.3d 898 (7th Cir. 2019). The plaintiffs in *Miller* were a group of Ramp Agents for Southwest Airlines at Midway Airport. Like the Plaintiffs here, the plaintiffs in *Miller* claimed that the airline had scanned and used their fingerprints in violation of BIPA. The Seventh Circuit ultimately ruled that the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, required them to bring their claims before an adjustment board (and not in federal court), and thus affirmed dismissal of their claims.

Southwest now moves to dismiss, relying heavily on the Seventh Circuit's decision in *Miller*. As a fallback, Southwest also argues that the Plaintiffs separately agreed to arbitrate their

claims. Southwest relies on an ADR Program that all four Plaintiffs accepted, as well as a Mediation Agreement joined by three of the four Plaintiffs.

For the reasons stated below, the motion is granted.

## Background

According to the amended complaint, Southwest's employees "are required, as a condition of employment, to have their fingerprints scanned by a biometric timekeeping device." *See* Am. Cplt. at ¶ 4; *see also id.* at ¶ 3 ("When Southwest hires an employee, he or she is enrolled in its Kronos employee database(s) using a scan of his or her fingerprint."); *id.* at ¶ 34. Southwest uses that biometric information to keep track of the time worked by its employees, using a system provided by former defendant Kronos. *Id.* at ¶¶ 2–4, 18, 34. Instead of swiping a badge or punching a timeclock, employees basically punch in and punch out of work at the touch of a finger. *Id.* at ¶ 35.

Southwest scanned the fingerprints of the four Plaintiffs when they joined the company. "As a condition of employment, Plaintiffs **were required** to scan their fingerprints" so that Southwest could use them to track their time. *Id.* at ¶ 47 (emphasis in original). Southwest stored their fingerprint data in its Kronos employee database. *Id.* at ¶ 48. Each work day, Plaintiffs use the fingerprint scanner at the beginning and the end of their shifts. *Id.* at ¶ 49.

All four Plaintiffs worked as Ramp Supervisors "or similarly-situated positions" at Midway Airport. *Id.* at ¶ 45. Crooms worked as a Ramp Supervisor from March 2015 until September 2016. *Id.* at ¶ 46. Lopez held that job from October 2011 through at least May 30, 2019 (when Plaintiffs filed the amended complaint). *Id.* Saxon had that job from November 2016 to May 30, 2019, and Hill had that role from June 2016 until November 2017. *Id.*

2

The amended complaint does not recount their full employment history with Southwest. Three of the four Plaintiffs (Lopez, Saxon, and Hill) began their careers as Ramp Agents. *See* Jordan Decl., at ¶ 4 (Dckt. No. 34-1). Southwest's website currently describes the job of a Ramp Agent as follows: "These Warriors work mostly outdoors: loading bags and cargo, directing our airplanes in and out of the gate, and assuring safe, ontime performance." *Southwest Careers*, Southwest Airlines, http://www.careers.southwestair.com/c/airport-operations-jobs (last visited May 10, 2020). Lopez, Saxon, and Hill used the fingerprint scanner to clock in and clock out when they were Ramp Agents. *See* Jordan Decl., at ¶ 8 (Dckt. No. 34-1).

Plaintiffs Lopez, Saxon, and Hill were later promoted to Ramp Supervisors. Crooms, the other Plaintiff, started at Southwest as a Ramp Supervisor. *See* Jordan Decl., at ¶ 4 (Dckt. No. 34-1). The key point is that three of the four named Plaintiffs provided their biometric information and used the fingerprint scanner as Ramp Agents, before becoming Ramp Supervisors. *Id.* at ¶ 8.

From a collective bargaining perspective, there is a big difference between Ramp Agents and Ramp Supervisors. Ramp Agents employed by Southwest at Midway Airport are represented by the Transportation Workers Union of America, ALF-CIO Local 555 ("the Union"). *Id.* at ¶¶ 5, 10. But Ramp Supervisors are not. *Id.*; *see also Saxon v. Southwest Airlines Co.*, 2019 WL 4958247, at *2 (N.D. Ill. 2019) (addressing a claim against Southwest under the Fair Labor Standards Act, brought by one of the four Plaintiffs here) ("There is one further important difference between Ramp Agents and Ramp Supervisors – the former are included in a CBA; the latter are not."). Under the Collective Bargaining Agreements, the Union is the "sole and exclusive bargaining agent" for the Ramp Agents. *See* Jordan Decl., at ¶ 7. The

3

Union's role isn't new – Southwest and the Union have entered into a series of collective bargaining agreements for decades. *Id.* at ¶ 6.

The Union represented Lopez, Saxon, and Hill when they scanned in and scanned out with their fingerprints as Ramp Agents. *Id.* at ¶¶ 8, 10. After their promotions, they were no longer bargaining unit employees. *Id.* But they continued to use the very same fingerprint scanning system that they used as Ramp Agents. *Id.* at ¶ 10. So their jobs changed, but the way that they clocked in and clocked out did not.

Plaintiffs ultimately sued Southwest and Kronos, alleging that the companies had unlawfully collected and used their biometric information without their consent. They filed suit under BIPA, an Illinois statute that "regulat[es] the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

The statute "requires collectors of this material to obtain the written informed consent of any person whose data is acquired. This regime is designed to protect consumers against the threat of irreparable privacy harms, identity theft, and other economic injuries arising from the increasing use of biometric identifiers and information by private entities." *Bryant v. Compass Group USA, Inc.*, 2020 WL 2121463, at *1 (7th Cir. 2020); *see also Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206–07 (Ill. 2019). Unlike other types of information, a biometric identifier is "biologically unique to the individual," so a person is at "heightened risk for identify theft" if his or her biometric information is compromised. 740 ILCS 14/5(c). The Act defines "[b]iometric identifier" to include a "fingerprint," so a claim about fingerprint data falls within its scope. *See* 740 ILCS 14/10.

The complaint includes three counts. First, Plaintiffs claim that Southwest failed to make, provide, and follow a retention schedule and guidelines for the permanent deletion of

biometric data. *See* Am. Cplt. ¶¶ 74–82. Second, Plaintiffs allege that Southwest failed to obtain informed written consent before collecting their biometric data. *Id.* at ¶¶ 83–92. Third, they claim that Southwest disclosed their biometric data without their consent. *Id.* at ¶¶ 93–101. Plaintiffs request statutory damages of $5,000 for each intentional and/or reckless violation of BIPA, injunctive and other equitable relief, attorney's fees, and other relief.

In addition to claims in their personal capacities, the named Plaintiffs brought claims on behalf of a purported class, too. They seek certification of a class of "[a]ll individuals working for Southwest in the State of Illinois who had their fingerprints collected, captured, received, obtained, maintained, stored, disclosed or disseminated by any Defendant during the applicable statutory period." *Id.* at ¶ 64.

Plaintiffs later dismissed their claims against Kronos (*see* Dckt. No. 74), so Southwest is the last remaining Defendant.

## Analysis

Southwest moves to dismiss on three grounds. The four named Plaintiffs are situated a little differently, so not every argument applies to each Plaintiff.

First, Southwest argues that the Railway Labor Act preempts the state law claims, and thus requires Plaintiffs to seek relief before an adjudgment board (and not in federal court). That argument applies to Plaintiffs Lopez, Saxon, and Hill (Plaintiffs 2, 3, and 4, in case it helps keep them straight) because they were represented by the Union when they worked as Ramp Agents. It does not apply to Plaintiff Crooms because he was not a Ramp Agent. He started as a Ramp Supervisor and was not part of the bargaining unit.

Second, the company contends that all four Plaintiffs agreed to arbitrate all employment-related disputes with Southwest when they became Ramp Supervisors. Southwest points to

annual acknowledgement forms that each Plaintiff electronically signed, agreeing to comply with its ADR Program. And the ADR Program requires arbitration for certain claims about their employment.

Third, the airline argues that Crooms, Lopez, and Hill (Plaintiffs 1, 2, and 4) agreed to arbitrate their BIPA claims with Southwest as part of a Mediation Agreement.

The common denominator of the three arguments is straightforward: this case does not belong in federal court. The Court agrees.

## I. Preemption under the Railway Labor Act.

Southwest first argues that this dispute belongs in front of an adjustment board, and does not belong in federal court, under the Railway Labor Act.

The Railway Labor Act governs the relationship between management and labor in the railway industry and the airline industry. *See* 45 U.S.C. § 151 *et seq.* Congress "promote[d] stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). "No one wants to see the nation's transportation network brought to a standstill because of labor conflict. The RLA therefore is designed to substitute bargaining, mediation, and arbitration for strikes." *See Bhd. of Locomotive Eng'rs and Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 755 (7th Cir. 2018).

A key part of that remedial regime is mandatory arbitration. The Act creates a different dispute-resolution scheme for so-called major disputes and minor disputes. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989). Major disputes involve the formation of collective bargaining agreements, and the Act requires bargaining and mediation. *Id.* Minor disputes arise out of grievances or out of the "interpretation or application of

agreements concerning rates of pay, rules, or working conditions." *See* 45 U.S.C. § 152 Sixth; *see also Bhd. of Locomotive Eng'rs*, 879 F.3d at 758. The Act imposes "compulsory and binding arbitration" before an adjustment board for minor disputes. *Consol. Rail*, 491 U.S. at 304. So "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* at 302.

The Seventh Circuit applied the arbitration requirements of the RLA to claims involving BIPA in *Miller v. Southwest Airlines Co.*, 926 F.3d 898 (7th Cir. 2019). That case, like this case, involved Southwest's timekeeping system using the workers' fingerprints. And that case, like this case, involved claims by current or former Ramp Agents.

The employees in *Miller* brought an assortment of claims under BIPA against Southwest, arguing that the company had used their biometric data without their consent. They claimed that the airline failed to provide necessary information, and improperly disclosed their biometric information to a third party. Southwest responded that the union had received the requisite notice and had consented on the employees' behalf. As a result, Southwest argued that the dispute belonged before an adjustment board, and did not belong in federal court.

The Seventh Circuit in *Miller* squarely addressed "whether persons who contend that air carriers have violated state law by using biometric identification in the workplace must present these contentions to an adjustment board under the Railway Labor Act." *Id.* at 900. The Seventh Circuit concluded that an adjustment board – not a federal court – needed to decide whether the union had consented to the use and collection of biometric data. The question of consent necessarily involved an interpretation of the collective bargaining agreement, and a "dispute about the interpretation or administration of a collective bargaining agreement must be resolved by an adjustment board under the Railway Labor Act." *Id.* at 903.

The dispute involved the working conditions for an entire workforce represented by a union, and thus implicated the collective bargaining agreement. "It is not possible even in principle to litigate a dispute about how an air carrier acquires and uses fingerprint identification for its whole workforce without asking whether the union has consented on the employees' collective behalf." *Id.* at 904. The necessity of interpreting the collective bargaining agreement meant that federal court was the wrong forum. "[I]f a dispute necessarily entails the interpretation or administration of a collective bargaining agreement, there's no room for individual employees to sue under state law – in other words, state law is preempted to the extent that a state has tried to overrule the union's choices on behalf of the workers." *Id.*; *see also Brown v. Illinois Cent. R.R. Co.*, 254 F.3d 654, 661 (7th Cir. 2001) ("[E]ven if [plaintiff's] claim is grounded upon rights which stem from some source other than the CBA (such as state law), the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be 'conclusively resolved' by interpreting the CBA.") (quoting *Hawaiian Airlines*, 512 U.S. at 261–62).

Southwest naturally argues that *Miller* disposes of this case, too. After all, the two cases involved the same employer, the same union, the same collective bargaining agreement, and the same Illinois statute. In fact, the employees in *Miller* were Ramp Agents at Midway Airport, too. *See Miller v. Southwest Airlines Co.*, 2018 WL 4030590, at *1 (N.D. Ill. 2018). Southwest points out that three of the named Plaintiffs (Lopez, Saxon, and Hill) were members of the Union as Ramp Agents, and thus the collective bargaining agreement governed their working conditions, just like the plaintiffs in *Miller*.

In response, Plaintiffs Lopez, Saxon, and Hill do not deny that they were members of the Union before they became Ramp Supervisors. In fact, Plaintiffs admit it. *See* Pls.' Resp., at 5

8

(Dckt. No. 39) (stating that three of the named Plaintiffs "left TWU 555," which necessarily means that they were part of the Union before their promotions); *see also id.* at 7 (stating that Plaintiffs were "no longer" represented by the Union after their promotions). They also do not deny that they used the same fingerprint scanner during their entire employment at Southwest, including their time as Ramp Agents and Ramp Supervisors. The scanner remained the same.

Plaintiffs make three arguments in an attempt to bypass *Miller*. First, Plaintiffs argue that it is a "fabrication" that the "union consented to the timekeeping system on their behalf when they first began their employment at SWA." *See* Pls.' Resp., at 5 (Dckt. No. 39). But that's an argument for the adjustment board, not this Court. The Seventh Circuit said so directly in *Miller*: "Whether Southwest's or United's unions *did* consent to the collection and use of biometric data, or perhaps grant authority through a management-rights clause, is a question for an adjustment board." *Miller*, 926 F.3d at 903 (emphasis in original).

Next, Plaintiffs argue that there was a six-month probationary period before they joined the Union. Maybe so, but it makes no difference. "Unions designated as exclusive representatives were (and still are) obligated to represent all employees, union members or not." *See Janus v. AFSCME, Council 31*, 942 F.3d 352, 354–55 (7th Cir. 2019); *see also Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2460 (2018) ("If a majority of the employees in a bargaining unit vote to be represented by a union, that union is designated as the exclusive representative of all the employees. . . . Employees in the unit are not obligated to join the union selected by their co-workers, but whether they join or not, that union is deemed to be their sole permitted representative."); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 556 (1991) (Scalia, J., concurring in part and dissenting in part) (explaining that "the law *requires* the union to carry – indeed, requires the union to go *out of its way* to benefit, even at the expense of its other

9

interests," nonunion members) (emphasis in original). So the Union represented their interests even before they formally joined the Union.

Even then, the probationary period was temporary. The three Plaintiffs do not deny that, at some point, the probationary period ended and they became members of the Union. So the collective bargaining agreement did govern their relationship with Southwest when they clocked in and out with the fingerprint scanner as Ramp Agents.

Plaintiffs' argument also proves too much. Every employee presumably goes through a probationary period to join the Union. If the existence of a probationary period were enough to avoid arbitration, the dispute resolution scheme of the RLA would lose much of its steam. Also, the existence of a probationary period made no difference in *Miller*, even though it involved the same Union and the same jobs for the same employer.

Finally, Plaintiffs try to pare back their claims to the period of time when they worked as Ramp Supervisors, not Ramp Agents. "Importantly, Plaintiffs here[] have brought their BIPA claims exclusively as Ramp Supervisors, which indisputably, was when they were ***not*** members of a union and ***not*** covered by a collective bargaining agreement." *See* Pls.' Resp., at 5 (Dckt. No. 39) (emphasis in original). They "seek recovery for BIPA violations they suffered only as non-union employees." *Id.* That makes a difference, they argue, because they were not part of the bargaining unit and thus were not represented by the Union at that time.

Plaintiffs claim that their proposed class is limited to non-union members. But that's not what the proposed class definition says. They asked for a class of "[a]ll individuals working for Southwest in the State of Illinois who had their fingerprints collected, captured, received, obtained, maintained, stored, disclosed or disseminated by any Defendant during the applicable

statutory period." *See* Am. Cplt. ¶ 64.  They asked for a class of *all* workers, union members or not.

In fact, even the individual claims of the named Plaintiffs do not appear to be limited to their time as Ramp Supervisors.  The amended complaint contains no such limitation.  If anything, the amended complaint does the opposite.  It repeatedly refers to the collection of their biometric data when they were *hired*.  *See* Am. Cplt. ¶¶ 3, 34, 47.  And when they were hired, three of them were Ramp Agents, not Ramp Supervisors.

Even then, Plaintiffs cannot avoid the need for arbitration by whittling down their amended complaint.  Southwest argues that the Union consented to the use of their biometric data when the three named Plaintiffs were members.  That consent, according to Southwest, was a once-and-for-all event.  That is, each employee needed to give his or her consent only one time, so if the Union consented on their behalf when they were Ramp Agents, then the Union consented on their behalf as Ramp Supervisors, too.  The consent stuck with them.

The Court agrees that the existence of consent – as well as the *scope* of consent – is a question for the adjustment board, not this Court.  There is not much daylight between the existence of consent and the scope of consent.  In the end, both address the same thing:  did the Union provide consent on behalf of the employees as contemplated by BIPA?

By its plain terms, BIPA requires an employer to obtain consent from an employee, either individually or from the employee's "legally authorized representative."  740 ILCS 14/15(b)(1), (b)(2), (b)(3), (d)(1), (d)(2).  That phrase includes labor unions.  *See Miller*, 926 F.3d at 903.  But BIPA says nothing about obtaining consent a second time when an employee changes roles within the company (but remains an employee all the while).  The statute says that an employer

must "first" obtain consent before collecting their biometric data, without suggesting that there might be a need for consent a second time. *See* 740 ILCS 14/15(b).

Plaintiffs' position seems especially tenuous given the allegations in their own complaint. Plaintiffs allege that Southwest enrolls employees in the biometric program and scans their fingerprints "[w]hen Southwest *hires* an employee." *See* Am. Cplt. ¶ 3 (emphasis added); *see also id.* at ¶ 34 ("[W]hen employees are hired by Southwest, they are required to have their fingerprints captured and stored to enroll them in its Kronos employee database(s)."). The complaint says nothing about any changes when employees become supervisors. Plaintiffs don't allege that Southwest collected any additional biometric data, or otherwise used their fingerprints in any different way after their promotions.

Southwest argues that the Union's consent was effective for all time, regardless of whether an employee changed roles within the company. That argument necessarily requires an interpretation of the collective bargaining agreement, and thus is the domain of an adjustment board. Maybe Plaintiffs have an argument that the collective bargaining agreement did not authorize the Union to give once-and-for-all consents. And maybe Plaintiffs can construct an argument that BIPA requires re-notice and re-consent, even if an employee changes roles within the company. But the punchline is the same – the proper forum to hear that argument is an adjustment board, not this Court.

Southwest's burden is "quite low." *See Bhd. of Locomotive Eng'rs and Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2018); *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 307 (1989) (noting the "'relatively light burden which the railroad must bear' in establishing exclusive arbitral jurisdiction under the RLA") (citation omitted). "Where an employer asserts a contractual right to take the contested

action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Consol. Rail*, 491 U.S. at 307. In the end, Southwest has raised a non-frivolous question whether the collective bargaining agreement authorized the Union to consent on behalf of all employees, even if some of them later left the bargaining unit. So the answer must come from the adjustment board, not this Court.

The final question is the proper procedural hook to use for the referral to the adjustment board. The Seventh Circuit has not resolved whether the Railway Labor Act's mandatory arbitration regime divests district courts of subject matter jurisdiction. *See Miller*, 926 F.3d at 901; *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 824–25 (7th Cir. 2014). When it comes to the RLA, "[n]one of this circuit's decisions considers the effect of the Supreme Court's modern understanding of the difference between 'jurisdiction' and other kinds of rules." *See Miller*, 926 F.3d at 901; *see also Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998) ("'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.'") (citation omitted); *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). One option is dismissal for lack of subject matter jurisdiction, and another is judgment on the pleadings under Rule 12(c). *Miller*, 926 F.3d at 901. The parties did not brief the issue, and for now, the Seventh Circuit has blessed both options. As a practical matter, it makes no difference because "either a substantive or a jurisdictional label ends the litigation between these parties and forecloses its continuation in any other judicial forum." *Id.* A dismissal by any other name still ends this case.

## II. Arbitration Agreements as Ramp Supervisors.

Southwest also moves to dismiss based on arbitration agreements that all four Plaintiffs accepted when they became Ramp Supervisors. Southwest has an Alternative Dispute Resolution Program for its non-union employees. *See* Vasquez Decl., at ¶ 1 (Dckt. No. 34-2).

13

Each year, Southwest sends its non-union employees a collection of company policies, including the ADR Program. *Id.* at ¶ 6. The ADR Program requires employees to arbitrate certain Covered Claims.

Each of the four Plaintiffs electronically signed an acknowledgment form by checking a box, agreeing to comply with the ADR Program. *Id.*; *see also* Dckt. No. 34-2, at 27, 29 of 45 (Crooms's ADR Acceptance); Dckt. No. 34-2, at 41, 43–45 of 45 (Lopez's ADR Acceptance); Dckt. No. 34-2, at 35, 37–39 of 45 (Saxon's ADR Acceptance); Dckt. No. 34-2, at 31, 33 of 45 (Hill's ADR Acceptance). For example, in 2016, Crooms checked a box stating that he had "read, reviewed and been given the opportunity to review, and [] ha[d] received the Alternative Dispute Resolution Program (Non-Contract Employees only)." *See id.* at 27 of 45. He "consent[ed] to electronic delivery, acknowledge[d] receipt of and agree[d] to fully comply with the standards, policies and procedures in these Policies." *Id.*

Again and again, the Supreme Court has explained that the Federal Arbitration Act establishes a "'liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) ("The Act reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2001) ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("[The Act] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.").

Section 2 of the Act is a sweeping coverage provision. It provides that arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. Employment contracts are no exception. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001). In fact, "[a]rbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation." *Id.*

But the Act also carved out an exception. Section 1 excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *See* 9 U.S.C. § 1; *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) ("Why this very particular qualification? By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers. And it seems Congress 'did not wish to unsettle' those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate.") (citation omitted).

In *Circuit City*, the Supreme Court interpreted the meaning of the last phrase in the sequence: "or any other class of workers engaged in foreign or interstate commerce." *See* 9 U.S.C. § 1. Applying the canon of *ejusdem generis* (that is, interpreting a general term in line with more specific terms in the string), the Supreme Court held that Section 1 does not apply to all employment contracts. Instead, Section 1 "exempts from the FAA only contracts of employment of transportation workers." *Circuit City*, 532 U.S. at 119. And courts, not arbitrators, decide whether Section 1 applies, that is, whether the case involves contracts with transportation workers. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537–38 (2019). So

before compelling arbitration, a court must decide if the case involves employment contracts of transportation workers.

Plaintiffs do not deny that they entered into arbitration agreements with Southwest. Instead, they argue that the Section 1 exemption applies to them because Ramp Supervisors are transportation workers. Plaintiffs discuss at length an eight-factor test adopted by the Eighth Circuit in *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 352 (8th Cir. 2005). But the Seventh Circuit has not adopted that framework.

For the second time in this case, there is a precedent that is squarely, eerily on point. In *Saxon v. Southwest Airlines Co.*, 2019 WL 4958247 (N.D. Ill. 2019), Latrice Saxon – the very same Plaintiff in this case – sued Southwest Airlines under the FLSA. She demanded unpaid overtime from working as a Ramp Supervisor at Midway Airport. There, as here, Southwest moved to dismiss based on an arbitration agreement. And there, as here, Saxon argued that the Section 1 exemption applied because she was a transportation worker.

Judge Dow provided a comprehensive overview of the case law about what it means to be a transportation worker within the meaning of Section 1. After a detailed survey, Judge Dow distilled the case law into a few discernible principles. First, "'drivers actually involved in the interstate transportation of physical goods'" qualify as transportation workers. *Saxon*, 2019 WL 4958247, at *4 (quoting *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483 (S.D.N.Y. 2008)). Second, drivers who make intrastate deliveries of locally produced goods (like the local pizza guy) are not transportation workers. *Id.* at *5. Third, "merely working in a transportation-*adjacent* industry or position – without transporting or handling goods or directing those who do – is not enough to qualify any employee as a transportation worker." *Id.* (emphasis in original). Finally, there is a split about "two classes of workers who handle goods that have traveled

interstate, but whose scope of work is entirely intrastate." *Id.* The two lines of cases "suggest that the linchpin for classification as a 'transportation worker' under *Circuit City* is actual transportation, not merely handling goods." *Id.* at *7. "That is, workers who transport goods intrastate as part of an interstate Pony-Express style network may be transportation workers, but those who merely handle those goods at one end or the other are not." Transportation workers transport; they do not merely handle.

Judge Dow ultimately concluded that Ramp Supervisors for Southwest are merely handlers, and thus do not qualify as transportation workers under the Act. *Id.* The job duties of Ramp Supervisors "at most include loading and unloading some cargo from Defendant's planes, along with supervising that task." *Id.* Saxon herself "does not transport cargo at all (even intrastate) and is therefore not a transportation worker." *Id.*

This case involves the same Plaintiff, with the same job, for the same employer, at the same airport. This Court gives the same answer to the same question. Ramp Supervisors are not transportation workers within the meaning of the Act, and thus the Section 1 exemption does not apply.

The last question is whether the arbitration agreements at issue covered the BIPA claims. Once again, the four named Plaintiffs are situated a little differently, because they joined and left the company at different times. And in the meantime, Southwest had two ADR Programs.

Southwest updated its ADR Program in 2018, and the new Program expressly applied to claims under the "Illinois Biometric Information Privacy Act (BIPA)." *See* Vasquez Decl., at ¶ 4 (Dckt. No. 34-2); Southwest Airlines Alternative Dispute Resolution Agreement, at 2 (Dckt. No. 34-2, at 18 of 45). Two of the Plaintiffs, Lopez and Saxon, agreed to Southwest's ADR Program in 2018, after the change in the ADR Program. *See* Dckt. No. 34-2, at 41 of 45 (Lopez's ADR

17

Acceptance in 2018); Dckt. No. 34-2, at 35 of 45 (Saxon's ADR Acceptance in 2018). So Lopez and Saxon agreed to arbitrate any BIPA claims.

But two of the Plaintiffs, Crooms and Hill, left the company before the revised 2018 ADR Program went into effect. *See* Am. Cplt., at ¶ 46 (alleging that Crooms left Southwest in 2016, and Hill was promoted to a Customer Service Supervisor in 2017 before leaving the company in 2018). They agreed to the old ADR Program. *See* Dckt. No. 34-2, at 27 of 45 (Crooms's ADR Acceptance in 2016); Dckt. No. 34-2, at 31 of 45 (Hill's ADR Acceptance in 2017).

The old version of the ADR Program did not expressly mention BIPA, and it did not explicitly refer to claims about biometric data. Instead, it provided that "Covered Claims shall only include wage and hour claims and claims under state or local leave laws arising out of the employment relationship between Southwest Airlines and the ADR Employee and recognized by applicable law." *See* Southwest Airlines Alternative Dispute Resolution Program, at 2 (Dckt. No. 34-2, at 9 of 45); *see also* Vasquez Decl., at ¶ 3 (Dckt. No. 34-2). The old ADR Program then listed a number of examples, such as claims for unpaid wages or other compensation, claims under state or local leave laws, and claims relating to specific times when employees are entitled to compensation. *See* Southwest Airlines Alternative Dispute Resolution Program, at 2 (Dckt. No. 34-2, at 9 of 45).

Crooms and Hill argue that the old ADR Program did not cover claims arising under BIPA. Otherwise, why add a reference to BIPA in 2018? That's instructive, but not dispositive. Sometimes drafters add language in the interest of clarity – to make explicit what was implicit – without changing the meaning. In response, Southwest counters that the old ADR Program covered "hour claims," which include claims about how it *records* hours.

18

The parties have a dispute about arbitrability – that is, a dispute about whether they agreed to arbitrate the dispute – which raises the antecedent question of who decides. Courts compel arbitration when there is: (1) a written agreement to arbitrate; (2) a dispute covered by or within the scope of the valid arbitration agreement; and (3) a refusal to arbitrate. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). Arbitration is a creature of contract, so parties may be compelled to arbitrate only the issues that they agreed to arbitrate. *See Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999).

But there is a thumb on the arbitration side of the scale. The party opposing arbitration bears the burden of demonstrating that the claims do not fall within the terms of the agreement. *See Green Tree Fin. Corp-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000). A request for arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior Gulf Nav Co.*, 363 U.S. 574, 582–83 (1960). Under the Federal Arbitration Act, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Crooms and Hill agreed to an ADR Program that covered "hour claims." The ADR Program did not define that open-ended term. And the long laundry list of examples underscores its breadth. True, the examples addressed *when* employees had to work, not *how* they had to clock in and clock out. Still, the examples were not exhaustive, and the term "hour claims" was not confined to disputes about when employees work, either. In short, this Court cannot say with

"positive assurance" that the phrase "hour claims" does not cover claims about how Southwest records their hours. *See United Steelworkers of Am.*, 363 U.S. at 582–83.

But there is an even more basic reason to send that question to the arbitrator. As a general matter, the "question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)) (brackets and italics in original); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964) ("[W]hether or not [t]he company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.") (quotation omitted).

Parties can agree to arbitrate arbitrability, meaning whether a particular dispute is within an arbitration agreement. Here, the parties agreed to arbitrate under AAA Rules. The Southwest ADR Program (effective 2015) provides that the arbitration "shall be conducted in accordance with the current version of AAA's Employment Arbitration Rules and Mediation Procedures ('AAA Rules')." *See* Southwest Airlines Alternative Dispute Resolution Program, at 4 (Dckt. No. 34-2, at 11 of 45). That decision impacts arbitrability.

"'[W]here the parties agree to arbitration pursuant to the rules of the American Arbitration Association ('AAA'), the parties incorporate the AAA's rules into the arbitration agreement.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 WL 832365, at *4 (N.D. Ill. 2020) (quoting *Dunston v. R.H. Love Galleries, Inc.*, 2008 WL 2339564, at *2 (N.D. Ill. 2008)). The AAA Rules "state that an arbitrator has the power to determine the scope of the arbitration agreement and the arbitrability of any claim or counterclaim." *Diaz v. Nintendo of America Inc.*,

20

2020 WL 996859, at *1 (W.D. Wash. 2020). AAA's Employment Arbitration Rules and Mediation Procedures provide: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *See Employment: Arbitration Rules and Mediation Procedures* § 6(a), American Arbitration Association (July 1, 2016), http://www.adr.org/sites/default/files/ Employment%20Rules.pdf.

Several Circuit Courts have ruled that incorporating AAA Rules constitutes "clear and unmistakable evidence" that the parties agreed to arbitrate the question of arbitrability. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 WL 832365, at *4 (cleaned up, citing multiple Circuits). "Although the Seventh Circuit has not specifically addressed whether a delegation clause can be incorporated by reference, it long ago held that an 'agreement of the parties to have any arbitration governed by the rules of the AAA incorporate[s] those rules into the agreement.'" *Ali v. Vehi-Ship, LLC*, 2017 WL 5890876, at *3 (N.D. Ill. 2017) (quoting *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir. 1976)). Many courts in this District agree with the "consensus in other circuits that incorporation of AAA Rules delegates arbitrability decisions to the arbitrator." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 WL 832365, at *5 (citing cases).

As a result, this Court concludes that the parties agreed to arbitrate the question of arbitrability. That is, it is up to the arbitrator to decide whether Crooms and Hill agreed to arbitrate their claims under BIPA when they agreed to arbitrate "hour claims."

In sum, any claims that the four Plaintiffs may have under BIPA must go to an arbitrator. They would need to go to arbitrator, that is, if there were no preemption under the Railway Labor Act. Three of the four Plaintiffs (Lopez, Saxon, and Hill) must press their claims before an

adjustment board in light of the Railway Labor Act. The other Plaintiff (Crooms) must arbitrate his claims before an AAA arbitrator. If it were not for the Railway Labor Act, the other three Plaintiffs would be headed to arbitration, too.

## III. The Mediation Agreement

Finally, Southwest argues that three of the Plaintiffs (Crooms, Lopez, and Hill) (Plaintiffs 1, 2, and 4) agreed to arbitration in a Mediation Agreement dated November 19, 2018. *See* Mediation Agreement (Dckt. No. 34-3). Whether a party entered into an agreement to arbitrate is a question for the Court, not an arbitrator. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013) (noting that courts decide "gateway matters, such as whether parties have a valid arbitration agreement at all"); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). The Court concludes that the three Plaintiffs agreed to arbitrate their FLSA claims – but not their *BIPA* claims – in the Mediation Agreement.

Unraveling the Mediation Agreement is a bit complicated, but the basic idea is that Southwest and a group of employees were attempting to resolve two different lawsuits involving two different statutes. The first case was the "FLSA Action" pending in the United States District Court for the Northern District of Illinois (18-cv-4822) (Aspen, J.). *See* Mediation Agreement, at 1 (Dckt. No. 34-3, at 2 of 5). It involved claims that Southwest owed unpaid overtime wages under the Fair Labor Standards Act and state law. The second case was the "BIPA Action" pending in the Circuit Court of Cook County (2018 CH 09376).[1] *Id.*

---

[1] The parties don't explain what relationship, if any, that state court case has to the case before this Court. Defendants did remove this case from state court, but the state court case had a different case number (2019 CH 01610) than the one referenced in the Mediation Agreement (2018 CH 09376). *See* Notice of Removal, at 1 (Dckt. No. 1). The Court assumes that it was the same type of BIPA case against Southwest, brought by different named plaintiffs.

The parties agreed to pursue private mediation and stay the two actions in the meantime. *Id.* The "FLSA Action mediation" would involve "only those individuals (currently 6 in number) who have filed opt-in consent forms in the FLSA Action." *Id.* at ¶ 2(a). Plaintiffs Crooms, Lopez, and Hill submitted opt-in forms in the FLSA Action, so the provision about mediating the FLSA Action applied to them. *See* Crooms Opt-In Form (Dckt. No. 34-5, at 2); Lopez Opt-In Form (Dckt. No. 34-4, at 2); Hill Opt-In Form (Dckt. No. 34-4, at 3). The "BIPA Action mediation" would involve the claims of the "named Plaintiffs and putative class members."[2] *See* Mediation Agreement, at ¶ 2(d) (Dckt. No. 34-3).

The parties agreed that if the FLSA Action mediation failed, the plaintiffs in that case would "promptly dismiss the FLSA Action and any claims stated in the FLSA Action will be submitted to individual arbitration with the AAA in accordance with the Southwest Airlines Alternative Dispute Resolution Program." *Id.* at ¶ 2(c). And if the BIPA mediation failed, the plaintiffs in that case would not oppose a motion to dismiss the BIPA Action with prejudice and compel arbitration. *Id.* at ¶ 2(e). The "sole purpose" of the agreement was to settle their disputes and, if they couldn't settle, then the parties would submit the "claims alleged in the BIPA Action and the FLSA Action to individual arbitration." *Id.* at ¶ 3.

The question is who agreed to the Mediation Agreement in the first place, and to what extent. The opening paragraph of the Mediation Agreement identified the "Parties." "This MEDIATION AGREEMENT ('Agreement') is entered into by and between Plaintiffs Jeff Battles, LeRome Thomas, and Steven Spencer" and "Southwest Airlines Co.," plus their

---

[2] The Mediation Agreement did not define the "named Plaintiffs" in the state-court BIPA action, and the parties did not reveal their identities, either. The Court pulled the docket in the state court case (2018 CH 09376). Based on that record, the Court assumes that the "named Plaintiffs" referred to Jeff Battles, Lerome Thomas, and Steven Spencer.

23

lawyers. *Id.* at 1. The Agreement defined that group as the "Parties," with no mention of any opt-in plaintiffs or any putative class.

The signature block, however, was more expansive, but not quite all-encompassing. Plaintiffs' counsel signed on behalf of "Plaintiffs Jeff Battles, LeRome Thomas, and Steven Spencer *and FLSA Action Opt-In Plaintiffs*." *Id.* at 4 (emphasis added). The signature block was consistent with paragraph 2(a), which referred to individuals who filed opt-in forms in the FLSA Action.

Did the Mediation Agreement cover the three named Plaintiffs here, meaning Crooms, Lopez, and Hill? And if so, in what capacity? They weren't mentioned in the opening paragraph, and they weren't mentioned by name in the signature block, either. The signature page did refer to the "***FLSA Action*** Opt-In Plaintiffs," and Crooms, Lopez, and Hill were opt-in plaintiffs in that case. *Id.* at 4 (emphasis added). So, they did agree to mediate their FLSA claims, and arbitrate them if mediation failed.

But they aren't part of the Mediation Agreement by virtue of their membership in the putative BIPA case. The Mediation Agreement did not purport to bind the members of the putative class in the BIPA Action. The opening paragraph and the signature block made no mention of the class members in the BIPA case. And in fact, plaintiffs' counsel had no authority to bind the putative class members in the BIPA Action. The state court had not certified a class, and there was no opt-in procedure in the BIPA Action, either. No one authorized plaintiffs' counsel to act on behalf of the putative class members with respect to potential BIPA claims.

Southwest doesn't argue that the Mediation Agreement applied to the three Plaintiffs because of their membership in the putative BIPA class. That is, Southwest doesn't argue that the agreement applied to the entire BIPA putative class at all. The company argues that the

agreement applied to Crooms, Lopez, and Hill (only). If the agreement bound all members of the putative BIPA class, then Saxon would be bound, too.

Instead, Southwest argues that Crooms, Lopez, and Hill were bound because they were "FLSA Action Opt-in Plaintiffs," and a reference to that group appears by the signature block. It is true that the Mediation Agreement applied to Crooms, Lopez, and Hill because they were FLSA Action Opt-in Plaintiffs. But that means that the agreement applied to them *in their capacity as* opt-in plaintiffs in the FLSA Action. The most natural reading is that the Mediation Agreement applied to them to the extent that it involved the "FLSA Action." It is a stretch to read "FLSA Action Opt-In Plaintiffs" to cover claims that had nothing to do with the FLSA Action.

That reading is consistent with the language of the opt-in consent forms in the FLSA Action, too. The top of the form referred to the "**SOUTHWEST AIRLINES UNPAID WAGE ACTION**." *See* Lopez Opt-In Form (Dckt. No. 34-4, at 2) (emphasis in original); Hill Opt-In Form (Dckt. No. 34-4, at 3) (same); Crooms Opt-In Form (Dckt. No. 34-5, at 2) (same). The signatories "consent[ed] to join this action seeking unpaid wages and overtime based on Southwest's violations of the Fair Labor Standards Act." *Id.* They designated plaintiffs' counsel to represent them "for all purposes of this action," meaning "this lawsuit." *Id.* The phrase "*this* action" used a definite article, and referred to the "action seeking unpaid wages and overtime" under the FLSA. *Id.* (emphasis added). There is no indication on the consent form that it applied to any other claims.

Viewed together, the consent forms gave counsel authority to act on behalf of Crooms, Lopez, and Hill in the FLSA lawsuit (only). Plaintiffs' counsel acted on their behalf when he signed the Mediation Agreement on behalf of the "FLSA Action Opt-In Plaintiffs." But the

25

"FLSA Action Opt-In Plaintiffs" agreed to arbitrate the FLSA claims, and did not agree to arbitrate claims that had nothing to do with the FLSA. So Crooms, Lopez, and Hill did not agree to arbitrate the BIPA-related claims in the Mediation Agreement.

## Conclusion

Defendant's motion to dismiss is granted. The claims of Plaintiffs Lopez, Saxon, and Hill are hereby dismissed because they must proceed before an adjustment board under the Railway Labor Act. The claims of Plaintiff Crooms are dismissed for improper venue under Rule 12(b)(3) because he agreed to arbitrate when he accepted Southwest's ADR Program, and the arbitration "shall be conducted in Dallas, Texas." *See* Southwest Airlines Alternative Dispute Resolution Program, at 4 (Dckt. No. 34-2, at 11 of 45); *see also Johnson v. Orkin, LLC*, 556 F. App'x 543, 544 (7th Cir. 2014) ("An arbitration clause is simply a type of forum-selection clause and a motion seeking dismissal based on an agreement to arbitrate therefore should be decided under Rule 12(b)(3).") (cleaned up); *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 808 (7th Cir. 2011) (same). But the Mediation Agreement does not require any of these four named Plaintiffs to arbitrate the BIPA claims.

Date: May 12, 2020

_____
Steven C. Seeger
United States District Judge